[Cite as *In re Adoption of M.M.R.*, 2017-Ohio-7222.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**CHAMPAIGN COUNTY**

IN THE MATTER OF THE
ADOPTION OF M.M.R.

:
:
:   C.A. CASE NO.   2017-CA-12
:
:   T.C. NO. 16-AD-9
:
:   (Civil Appeal from Common Pleas
:    Court, Probate Division)
:
:

. . . . . . . . . . .

**O P I N I O N**

Rendered on the ____15th___ day of _____August_____, 2017.

. . . . . . . . . . .

KIRK D. ELLIS, Atty. Reg. No. 0055275, 121 S. Main Street, Urbana, Ohio 43078
        Attorney for Appellant

ROBERT N. LANCASTER, JR., Atty. Reg. No. 0039461, 700 East High Street, Springfield, Ohio 45505
        Attorney for Appellees

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} The biological mother ("Mother") of M.M.R. appeals from a judgment of the Champaign County Court of Common Pleas, Domestic Relations-Juvenile-Probate Division, which found that her consent to her daughter's adoption was not required. The trial court's conclusion was based on its finding that Mother had failed to support the child,

without justifiable cause, for at least one year preceding the filing of the adoption petition. For the following reason, the trial court's judgment will be affirmed.

## I. Procedural History

{¶ 2} M.M.R. was born in August of 2014, to Mother and Father, who were not married. Father died in late May of 2015. "Cousin" is the first cousin of Father. Cousin and her husband ("Husband") have been married since September 2011, and they have two young children (ages 2 and 3) together. M.M.R. began living with Cousin and Husband in June 2015, when she was 10 months old, and has been living exclusively with Cousin and Husband since July 5, 2015.

{¶ 3} On September 28, 2016, Cousin and Husband filed a petition for adoption. The petition did not indicate that Mother's consent was not required. On October 20, 2016, Cousin and Husband filed an amended adoption petition, indicating that Mother's consent was not required, because Mother had failed, without justifiable cause, to provide maintenance and support for M.M.R. for one year preceding the petition.

{¶ 4} On March 14, 2017, the trial court held a hearing on whether Mother's consent was required for the adoption. Mother, Cousin, and Husband testified. On April 19, 2017, the trial court concluded that Mother's consent to M.M.R.'s adoption was not required. Mother appeals the trial court's judgment. *See In re Adoption of Greer*, 70 Ohio St.3d 293, 638 N.E.2d 999 (1994), paragraph one of the syllabus ("A trial court's finding pursuant to R.C. 3107.07 that the consent to an adoption of a party described in R.C. 3107.06 is not required is a final appealable order.").

## II. Was Mother's Consent Required

{¶ 5} It is well established that " '[a] parent has a fundamental right to care for and

have custody of his or her child.'   Those rights are terminated when a child is adopted."
(Citation omitted.)   *In re Adoption of E.E.R.K.*, 2d Dist. Miami No. 2013 CA 35, 2014-
Ohio-1276, ¶ 16.   "Any exception to the requirement of parental consent [to adoption]
must be strictly construed so as to protect the right of natural parents to raise and nurture
their children."   *In re Schoeppner*, 46 Ohio St.2d 21, 24, 345 N.E.2d 608 (1976); *id.* at ¶
17.

{¶ 6} R.C. 3107.07(A) provides, in pertinent part, that consent to adoption is not
required of the parent of a minor "when it is alleged in the adoption petition and the court,
after proper service of notice and hearing, finds by clear and convincing evidence that the
parent has failed without justifiable cause to provide more than de minimis contact with
the minor or to provide for the maintenance and support of the minor as required by law
or judicial decree for a period of at least one year immediately preceding * * * the filing of
the adoption * * *."

{¶ 7} Probate courts undertake a two-step analysis when applying R.C.
3107.07(A).   The first step involves deciding a factual question or questions: whether the
parent had failed to provide for the support and maintenance of a minor child or had failed
to have more than de minimis contact with the child.   Probate courts have broad
discretion over these factual determinations, which will not be disturbed absent an abuse
of discretion.   *In re Adoption of J.R.H.*, 2d Dist. Clark No. 2013-CA-29, 2013-Ohio-3385,
¶ 25-28, citing *In re Adoption of M.B.*, 131 Ohio St.3d 186, 2012-Ohio-236, 963 N.E.2d
142, ¶ 21-23*; In re R.L.H.*, 2d Dist. Montgomery No. 25734, 2013-Ohio-3462, ¶ 12.

{¶ 8}  If a probate court finds a parent's failure to provide maintenance and support
or to have less than de minimis contact with the child, the court's second step is to

determine whether justifiable cause for the failure has been proven by clear and convincing evidence. *In re J.R.H.* at ¶ 27. The question of whether justifiable cause for such a failure has been proven in a particular case is a determination for the probate court and will not be disturbed on appeal unless such determination is against the manifest weight of the evidence. *Id.*, quoting *In re Adoption of Masa*, 23 Ohio St.3d 163, 492 N.E.2d 140 (1986), paragraph two of the syllabus.

{¶ 9} " 'In determining whether a judgment is against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice" that there must be a reversal of the judgment and an order for a new trial.' " *In re Adoption of B.A.H.*, 2d Dist. Greene No. 2012-CA-44, 2012-Ohio-4441, ¶ 21, quoting *Steagall v. Crossman*, 2d Dist. Montgomery No. 20306, 2004-Ohio-4691, ¶ 29.

{¶ 10} Husband testified that he and Cousin first learned of M.M.R. at Father's funeral in May of 2015. He stated that, in the days following the funeral, Cousin had a "growing concern" for Mother and M.M.R., and Cousin reached out to Mother on Facebook, offering babysitting assistance with M.M.R. Husband testified that Mother asked him and Cousin to watch M.M.R. while she (Mother) attended a concert. Mother left M.M.R. with Cousin and Husband for a few days. On a few occasions between June 13 and July 5, 2015, Mother would take M.M.R. overnight, but M.M.R. was otherwise with Cousin and Husband. Husband stated that M.M.R. has lived with him and Cousin continuously since July 5, 2015.

{¶ 11} When asked about the agreement between Mother, Cousin, and Husband,

Husband responded: "There was never a concrete agreement. It was just kind of always, you know, she would say I'm getting a place or got a job or something. It just kind of evolved. So we were in a little bit of limbo not really knowing what – never had any concrete arrangements. Despite the fact we tried to have conversations about that." Husband stated that Mother twice offered to provide some support for M.M.R. He indicated that, at the beginning, she offered to bring food and diapers and, at another time, offered to pay for swim lessons; Husband testified that Mother did not follow through with either offer. Mother offered financial assistance to Cousin and Husband, but Husband stated that she did not follow through with that, either. Husband acknowledged that he did not request money, clothing, or food from Mother.

{¶ 12} Husband further testified that Mother would say she would come to visit, but would not come. Husband stated that "there would be months at a time where we would not hear from her and not know where she was." Husband testified that he once heard from Mother's stepmother that Mother was in jail in Utah; Husband had not known that Mother had left the state. Husband indicated that the primary method of communication between Mother and Cousin was through Facebook messaging.

{¶ 13} Husband testified that M.M.R. is well cared for, and that he and Cousin have been able to provide her with food and shelter. Husband stated that he and Cousin have taken her to every doctor appointment. Husband testified that he and Cousin have not kept M.M.R. from her mother. He indicated that Mother last saw M.M.R. on the child's second birthday (in August of 2016) and the day after the birthday; Mother's previous visit had been Christmas 2015.

{¶ 14} Cousin testified that she knew Mother was going through a hard time with

Father's death, and she offered to help Mother with babysitting if Mother needed a break or wanted to go out. Cousin testified that there was no "real discussion," but she assumed that she would have M.M.R. overnight or for a weekend. Cousin stated that Mother initially said she would bring by diapers and offered to pay for swim lessons, but Mother "never followed through." Cousin stated that she never asked Mother for money, because Mother was always saying that she was trying to get a job or find her own place. Cousin testified, "So at what point do you ask somebody that doesn't have a job for money." Cousin stated that Mother did not share the money Mother had gotten for M.M.R. from a government agency. Cousin indicated that Mother had not provided any financial maintenance or support for M.M.R. in the 12 months preceding the filing of the adoption petition.

{¶ 15} Cousin stated that she and Husband have provided M.M.R. with a place to live, food, education, medical care, and the like since M.M.R. has been with them. Cousin testified that Mother had not seen M.M.R. since early August of 2016, and has not asked about her. Cousin testified that, at some point, Mother indicated that she would be over to visit every Wednesday (when Mother went to La Palma, near Cousin's residence, to sing)[1], but Mother did not come.

{¶ 16} Cousin stated that, in July 2016, she brought up with Mother her (Cousin's) intention to pursue the adoption of M.M.R. Cousin stated that Mother responded that she did not want to give up her rights.

{¶ 17} Mother agreed that since June 13, 2015, M.M.R. has resided with Cousin and Husband, and that Cousin and Husband provided for M.M.R.'s food, clothing, shelter,

---

[1] *See infra* ¶ 21.

medical care, education, and discipline. She acknowledged that she did not provide financial assistance for M.M.R. for the year prior to the filing of the adoption petition. Mother also stated that, "short of gifts for holidays," she did not provide any kind of food, clothing, or shelter for her daughter for the year prior to the filing of the petition. She testified that she did not believe her financial assistance was necessary and that Cousin and Husband were "blasé" about it.

{¶ 18} Mother testified that she resides on the farm of a family friend, who often travels for his job. Mother has a high-school education, and at the time of the hearing, she was employed painting vehicles. Mother indicated that she "took three or four years off to have my kids and their fathers were working[,] but other than that, [she's] had part-time things here and there." She indicated that, from Memorial Day 2015 to summer 2016, she did not have "her life together," and during the year preceding the filing of the adoption petition, she "worked here and there * * * enough to pay my electric and pay my bills. But I didn't have a steady job." Mother acknowledged that she "was never desperate"; she stated, "I live minimally and I have what I need."

{¶ 19} Mother testified that she has two other children with other fathers. Mother testified that while M.M.R. was with Cousin and Husband, her other children were also placed with relatives. Mother testified that she was now co-parenting her other children, and she hoped for a similar arrangement for M.M.R. Mother indicated that Cousin told her that Cousin and Husband wanted to adopt M.M.R., and that Mother tried to talk with Cousin's attorney and another individual to prepare paperwork for a different custodial arrangement. Mother acknowledged that she has not communicated with Cousin or tried to see M.M.R. since receiving the adoption paperwork; Mother explained that "it hurts"

and that she "did not want to aggravate a situation that was at one point extremely positive and healthy." Mother reiterated that she was "okay" with Cousin and Husband having M.M.R., but she did not want to consent to the adoption, because she would want some sort of shared parenting.

{¶ 20} Mother stated that she received Social Security money for M.M.R. in August or September 2016, but she used the money to prepare her household for the return of her children; she acknowledged that she did not give any of that money to Cousin and Husband. Mother stated that she used money she received to fix her house and purchase a seven-passenger van. Mother specified that she fixed the chimney and the "roof of the chimney around it," installed a new stove, finished the plumbing, and bought new beds for her children. Mother indicates that she receives $709 per month for M.M.R., but has not used it for M.M.R.; Mother stated, "In my opinion, keeping my household and myself and everything on the road and me in working order is foreseeably helping me keep my kids and household together." Mother acknowledged that she has not saved any money for M.M.R.

{¶ 21} Upon being asked about the horse that Mother has, Mother testified that it is a retired pasture pony that lives in a friend's pasture; Mother stated, "He doesn't cost a whole lot." Mother was also asked about going to La Palma on Wednesdays. Mother testified, "I love music. It keeps me sane. There is a group of old ladies there and we range in age of 26 to 72 and we've all been widowed. We sing sad, old country songs and drink margaritas on Wednesdays." Mother acknowledged that she occasionally contributed to the drink costs at La Palma and that she spends $10 to $15 per week for cigarettes. Upon further cross-examination, Mother stated, "Yeah, I had a little extra

[money] here and there."

**{¶ 22}** After the hearing, Cousin and Husband filed a motion asking the trial court to order Mother to produce copies of the Social Security award letters granting a lump sum award and a period payment award for M.M.R. due to the death of Father. Cousin and Husband asserted that those documents were relevant to Mother's credibility. Mother filed those documents on March 31, 2017.

**{¶ 23}** In its judgment, the trial court made the following findings:

- The child's biological father is deceased.

- [Mother] has had very sporadic limited contact with the child in the last year.

- There is no dispute that [Mother] did not provide for the maintenance and support of her child for the year preceding the filing of the adoption petition.

- [Mother] understood and knew she had a duty to provide for her child.

- [Cousin and Husband's] income and resources could not be extensive because [Husband] is a student, there was no evidence that [Cousin] is employed, and they have two small children of their own that they care for and support.

- There is no Court ordered child support and [Cousin and Husband] have not requested such an order.

- [Mother] testified that she was never economically desperate (just grieving and depressed), that she received public assistance for the child, and she received Social Security benefits for the child. In addition, she was employable as she worked at several different jobs in the last year.

- [Mother] often asked what the child needed and offered to supply those needs but never actually followed through. These offers indicate [Mother] believed her

assistance may have been needed.

- [Cousin and Husband] could only communicate with [Mother] through Facebook Messenger and often did not hear from her or know where she was located.

- [Cousin and Husband] did not specifically request assistance from [Mother] because she offered assistance and then did not follow through thereby making any requests seem futile. They would have accepted any assistance provided by [Mother].

- [Mother] has a **horse** for which she provides maintenance and support.

- The public assistance and the Social Security benefits [Mother] received for the child were never shared with [Cousin and Husband], but instead went towards [Mother's] personal needs, - renovation of a house that does not belong to her and a vehicle, - with no benefit to the child.

- [Cousin and Husband] provided all maintenance and support for the child beginning in July 2015, and continue to present day.

(Emphasis in original.) Based on those findings, the trial court further found that Mother "failed without justifiable cause to provide for the maintenance and support of the child for at least one year immediately preceding the filing of the petition for adoption." The trial court concluded that Mother's consent to M.M.R.'s adoption was not required.

{¶ 24} On appeal, Mother claims that she had justifiable cause for failing to provide maintenance and support for M.M.R. (She does not dispute that she failed to provide maintenance and support to M.M.R. for the relevant one-year period.) She asserts that her situation was analogous to those in *In re Adoption of Hadley*, 2d Dist. Greene No. 90 CA 117, 1991 WL 227737 (May 6, 1991) and *In re Adoption of LaValley*, 2d Dist.

Montgomery No. 17710, 1999 WL 961785 (July 9, 1999).

{¶ 25} In *Hadley*, the child's biological mother and the prospective adopted parents, the Hadleys, had an informal agreement whereby the Hadleys took the child in their home and the mother came to visit from time to time. With respect to maintenance and support, the mother never provided support to the Hadleys, and the Hadleys had never indicated that they did not need to be paid. However, they had never asked for support and indicated that they did not expect any. The trial court concluded that the mother's failure to provide support for her child was justifiable. The Hadleys appealed. We affirmed the trial court, holding:

> Where a child's needs are being adequately provided for by step-parents, who are in a better financial position than the natural parent, and the step-parents, being aware of the natural parent's financial circumstances, express no interest in receiving financial assistance from the natural parent, we conclude that the natural parent's failure to contribute towards the support of the child is not "without justifiable cause," for purposes of R.C. 3107.07(A).

*Hadley* at *3.

{¶ 26} We followed *Hadley* in *LaValley*, stating:

> The case sub judice is indistinguishable from *Hadley*; therefore, we find it controlling. Here, the [prospective adoptive parents] never asked LaValley for financial assistance. Additionally, no court order was ever issued against LaValley, ordering her to pay support for [her child]. LaValley reasonably believed that [her child] was being well provided for by the

[prospective adoptive parents], who had a combined annual income of nearly $100,000, and she had no reason to believe that her financial assistance was necessary for the child's support. Furthermore, while the evidence shows that LaValley could have paid some support for [her child], it also shows that LaValley was in dire financial circumstances during the one-year period in question. Therefore, the trial court's determination that LaValley failed, without justifiable cause, to make any contribution towards her child's support is against the manifest weight of the evidence.

*LaValley* at *5.

**{¶ 27}** We discussed *Hadley* in *In re Adoption of J.M.N*, 2d Dist. Clark Nos. 08-CA-23, 08-CA-24, 2008-Ohio-4394. We indicated that our rationale in *Hadley* and its progeny "is in accord with the purpose and intent * * * of the consent statute, which is to identify when a parent has abandoned her child." *J.M.N.* at ¶ 18. For the failure to provide support to be justifiable, "[c]ritically, there must be evidence that the parent made a conscious decision not to provide support based on a reasonable belief that her financial support was unnecessary." *Id.* We noted that *Hadley* cautioned that "[i]f a parent has any reason to believe that his or her financial assistance may be reasonably necessary for the support of the child, then the failure to provide any financial assistance for a full year evinces such a complete abdication of parental responsibility as to justify the termination of the parental relationship in favor of adoption." *Id.*, quoting *Hadley*.

**{¶ 28}** Here, as in *Hadley* and *LaValley*, the evidence reflects that Mother had limited employment income and that Cousin and Husband did not expressly request financial assistance from Mother. Further, there was no court order requiring Mother to

pay support for M.M.R.   We nevertheless find *Hadley* and *LaValley* to be distinguishable.

{¶ 29} First, *Hadley* and *LaValley* relied in part, on evidence that the adopting parents were in a better financial position than the natural parent.   While Mother was unemployed for a portion of the one-year period preceding the filing of the adoption petition, the trial court reasonably found that Mother "was never economically desperate" and was employable.   And, there was no evidence at the hearing that Cousin and Husband were significantly better off financially than Mother; Husband testified that he was a full-time student at the University of Dayton, and there was no evidence that Cousin had significant income.[2]   (The court's home study, conducted prior to the hearing, reflected that Cousin was self-employed as a photographer.)   In addition, Cousin and Husband's general failure to request financial assistance from Mother was influenced by Mother's consistent failure to follow through when Mother indicated that she would provide money or other items for M.M.R. and by Mother's statements to Cousin which suggested that she (Mother) did not have the means to provide support.   Although Mother testified that Cousin and Husband were "blasé" about financial support from her, the trial court could have reasonably concluded that Mother did not reasonably believe that Cousin and Husband did not need financial assistance for M.M.R.

{¶ 30} Moreover, Mother testified that she received Social Security income that was specifically provided for the support of M.M.R., yet she did not provide that money to

---

[2] The Assessment for Child Placement (home study) report, filed with the trial court on December 30, 2016, reflects that Cousin has gross annual income of $6,000, Husband receives a school living allowance of $6,700 per semester, and the family receives SNAP food benefits of $770 per month.   The report itemized the family's expenses and concluded that the couple "appear to live responsibly on their income and to be able to continue to care for [M.M.R.'s] needs."

Cousin and Husband. Mother testified that she used those funds to purchase a van and make improvements on the home in which she lived, but did not own. Mother's supplemental filing indicated that, around August 29, 2016, Mother received a Social Security survivor's award of $4,254, which reflected money that M.M.R. was due for February 2016 through July 2016. Into early 2017, Mother received $709 per month around the second Wednesday of each month. (Cousin and Husband now receive those payments.) The trial court could have reasonably concluded that Mother consciously decided to use funds that were expressly intended for M.M.R.'s support for her (Mother's) own purposes rather than for her child.

{¶ 31} In addition, although Mother testified that her horse was pasture fed and did not "cost a whole lot," Mother maintained a horse throughout the relevant one-year period, while not providing any support for M.M.R. Although Mother's appellate brief suggests that the trial court gave these facts too much weight, this testimony supports a finding by the court that Mother prioritized the support of her horse over the support of her child. Mother also acknowledged that she purchased cigarettes ($10 to $15 per week), occasionally bought drinks at La Palma, and "had a little extra [money] here and there." Even assuming that Mother had little discretionary income from which to support M.M.R., the record supported a conclusion that Mother simply chose not to support M.M.R. during the one-year period prior to the filing of the adoption petition.

{¶ 32} Having reviewed the entire record, we conclude that the weight of the evidence supports the trial court's determination that Mother's failure to support M.M.R. was not justifiable. Accordingly, the trial court did not err in concluding that Mother's consent to M.M.R.'s adoption was not required. Mother's assignment of error is

overruled.

## III. Conclusion

**{¶ 33}** The trial court's judgment will be affirmed.

. . . . . . . . . . . .

HALL, P.J. and TUCKER, J., concur.

Copies mailed to:

Kirk D. Ellis
Robert N. Lancaster, Jr.
Hon. Lori L. Reisinger