[Cite as *In re Adoption of O.S.R.*, 2024-Ohio-2090.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
DARKE COUNTY

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF   O.S.R. (proposed name after adoption) | : : : : : : : : : : : | C.A. No. 2024-CA-2<br><br>Trial Court Case No. 23-5-007<br><br>(Appeal from Common Pleas Court-Probate Division) |

. . . . . . . . . . .

O P I N I O N

Rendered on May 31, 2024

. . . . . . . . . . .

NICOLE L. POHLMAN, Attorney for Appellant

DAVID A. ROHRER, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} A.N.R. and C.M.R. ("Petitioners") appeal from the Darke County probate court's judgment denying their petition to adopt their nephew ("the child"). The probate court found that Petitioners had failed to establish that the biological father's consent to the adoption was not required. For the following reasons, the judgment of the trial court will be affirmed.

**Facts and Procedural History**

{¶ 2} The child was born in March 2022. His biological father ("Father") was named on the birth certificate. Petitioners, a maternal aunt and uncle, filed a petition for adoption on April 27, 2023. The child's biological mother ("Mother") filed a consent to the adoption, but Father objected to it. The probate court scheduled a hearing on the matter.

{¶ 3} On July 7, 2023, Father filed a "Motion in Opposition" to the petition for adoption, in which he argued that he had satisfied the statutory requirements of having contact with the child and providing maintenance and support for him, such that his consent to the adoption was required. Father asserted that he both consistently sought contact with the child and was in communication with Mother. He also asserted that, on May 30, 2023, he had sought a determination of his child support obligation from the Darke County Child Support Enforcement Agency and that he intended to seek custody of the child in Darke County Juvenile Court once the adoption matter was resolved.

{¶ 4} The probate court conducted a consent hearing on December 15, 2023, after which Petitioners submitted a brief in support of their position that Father's consent was not required. On January 16, 2024, the probate court concluded that Father's consent to the adoption was required; because Father refused to consent, the probate court denied the adoption petition.

**Assignments of Error and Analysis**

{¶ 5} Petitioners raise two assignments of error. For ease of analysis, we will consider them together.

THE TRIAL COURT ABUSED ITS DISCRETION IN RULING THAT [FATHER] PROVIDED FOR THE MAINTENANCE AND SUPPORT OF THE MINOR CHILD FOR ONE YEAR PRIOR TO THE FILING OF THE PETITION FOR ADOPTION AND THAT HIS CONSENT TO THE ADOPTION WAS THEREFORE REQUIRED.

THE TRIAL COURT ABUSED ITS DISCRETION IN RULING THAT [FATHER] HAD MORE THAN DE MINIMIS CONTACT WITH THE MINOR CHILD FOR ONE YEAR PRIOR TO THE FILING OF THE PETITION FOR ADOPTION AND THAT HIS CONSENT TO THE ADOPTION WAS THEREFORE REQUIRED.

### Evidence Presented at the Consent Hearing

{¶ 6} At the consent hearing, Father testified that his paternity had been established by his signing of an affidavit acknowledging paternity at the hospital. According to Father, he paid for "bills" at the hospital, specifically a breast pump, bottles, and formula. He had no evidence in support of this assertion, such as receipts, cancelled checks, or bank statements.

{¶ 7} Father testified that the child had been born prematurely in March 2022 and had remained in the hospital after his birth. The child was released on June 7, 2022, and then lived with Father and Mother in a rental property on Red River-West Grove Road ("the rental property"). Father testified that he had paid the deposit and first month's rent at the residence and then moved out in July 2022. He presented no receipts, cancelled checks, or bank statements to substantiate these payments.

{¶ 8} Father denied that Mother took the child to live with her parents a couple of weeks after the child was released from the hospital. According to Father, Mother and the child sometimes went to her parents' house and stayed there, but Mother's belongings remained in the rental property and she was still living there.

{¶ 9} Father testified that he had purchased diapers for the child for the child's birthday and for Easter; he delivered them to Mother at the rental property and left them there when no one answered the door. Father stated that he had purchased a bassinet for the child, and Mother had proof that he did so. According to Father, "[e]very single holiday from the day me and her broke up I went there and took [the child] a boatload of stuff, whether that consisted of clothes, shoes, food, bottles, toys." Father did not directly hand the items to Mother He acknowledged that he never provided cash to Mother or any member of her family for the child.

{¶ 10} Father was never subject to a court order obligating him to pay child support. He acknowledged that an obligation existed for him to provide for the child regardless of his relationship with Mother Father denied knowing whether Mother was at her parents' home or at the rental property, or if she had taken the child "out of state or anything."

{¶ 11} Father was employed at Fram at the time of the child's birth through 2023. After being laid off at Fram, Father worked at Wendy's and Whirlpool. He acknowledged that during the relevant 12-month period prior to the filing of the adoption petition, he was employed and had had the ability to provide financial support for the child. According to Father, he tried to make contact with Mother to "get her to let me bring her stuff or hand

her money. She would always set up a time or cancel on me or give me the runaround." She would never actually meet with him or give him an answer about whether they could meet. According to Father, Mother advised him that he would have to go to court to establish his parental rights in order to see the child, but then she would also sometimes call him late at night and "tell [him] she missed [him] and * * * wanted to get back together." Father testified that he had not sought to establish his parental rights in court because he did not know if he and Mother were going to get back together.

{¶ 12} Mother testified that she had resided at the rental property. According to Mother, her parents paid the deposit and first month's rent for the rental property, she moved into the residence in May 2022, and Father made no payments. She acknowledged that the newborn child was in the hospital until June 7, 2022. Mother testified that her grandmother had paid the rent for June 2022. Less than two weeks after the child was released from the hospital, she and Father ended their relationship; Mother then moved in with her parents until early July 2022. At that time, she moved back to the rental property, while the child remained with her parents.

{¶ 13} Mother denied that Father had paid for any of her medical expenses during her pregnancy or had bought a crib or other furniture, diapers, clothes, shoes, formula, or baby food. She acknowledged that Father had purchased a breast pump and stated that it had been reimbursable by insurance; she stated that Father took the breast pump when he moved out. According to Mother, Father never provided any financial assistance to her and had known how to contact her; she denied ever telling him that she did not want financial help with the child.

{¶ 14} Mother testified that she had been working at Whirlpool at the time of the child's birth; she stated that she had insurance, but it didn't pay for "any of the birthing expenses." She received bills from the hospital but never sent them to Father Mother testified that Father moved out of the rental property around July 1, 2022, but later acknowledged that he left in the middle of June. Mother identified a purported release of Father from the lease at that residence (Exhibit A), which was dated July 1, 2022, and signed by Father and the landlords; Exhibit A stated: "[Father] returned the door key and garage door opener on this date for the property located at * * * Red River-West Grove Rd., Laura, Ohio * * *. [Father] is from this date forward no longer responsible for rent or lease payment on this property. The lease for [Father] is therefore terminated as of this date."

{¶ 15} Mother testified that she had allowed Father and his mother to see the child on Father's Day 2022 at the rental property. She stated that Father also had come to her parents' home one time, "but he was not allowed inside." She denied that her father had threatened Father on that occasion. Father never came back to her parents' home.

{¶ 16} Mother acknowledged that Father left "plastic toys or suckers, little things like that," at the rental property, but never formula. Mother did not seek child support for the child because she "didn't need to" while she was working at Whirlpool. At the time of the hearing, Mother was not working at Whirlpool, having been terminated for taking too much time off work.

{¶ 17} Mother and Father continued to text each other from June 15, 2022, to March 1, 2023, as reflected in Exhibit B. Mother acknowledged that she occasionally

told Father she missed him in her text messages, and that she had thanked him around Christmas for the gifts he brought for the child. On cross-examination, Mother acknowledged that Father also brought gifts for the child for Thanksgiving, Valentine's Day, and the child's first birthday. Mother testified that Father asked to see the child a "few times," but she usually told him they were busy. Mother did not make any effort to facilitate Father's contact with the child, and she stated in one of her text messages that if he wanted to see the child, "he would need to go to court." Mother did not tell Father about discussing the child's adoption with Petitioners. On cross-examination, Mother contradicted her testimony on direct examination that she had not filed for child support; she admitted that she had but stated that she had never directly asked Father for support.

{¶ 18} Mother testified that Father's mother had stayed at the rental property for a couple of days when the child came home from the hospital; during that time, Mother had paid for food because she was receiving money while on maternity leave. She denied that Father had paid for groceries when he lived with her and stated that her parents had also helped a lot with groceries.

{¶ 19} On redirect examination, Mother reiterated that she had lived with Father and the child at the rental property for less than two weeks; after that short period, she moved into her parents' home until Father moved out, then Mother returned to the rental property. Mother stated that Father's visit on Father's Day 2022 had been about 20 minutes in length, and he had spent no time with the child; instead, he sat on the porch with Mother. The gifts he brought were a rattle, a toy car, a bubble machine, "a couple suckers," a kiddy pool, some bouncy balls, a couple of stuffed animals, and some plastic

sailboats. Mother reiterated that Father never brought diapers, formula, any necessary furniture, clothing, or shoes. Mother and Father had discussed getting back together during phone calls, but Father had never asked to see the child or if he could provide any financial support.

{¶ 20} The child's maternal grandfather ("Grandfather") testified that, when the child was first released from the hospital, the child resided at the rental property on Red River-West Grove Road. Grandfather testified that he and his wife had paid the deposit and first month's rent, but he did not remember the form of payment because his wife took care of it. According to Grandfather, his wife's mother made the rental payment the following month.

{¶ 21} Grandfather testified that Mother and the child moved into his home around the second week of June 2022, and then Mother then moved back to the rental home around the first of July. The child continued to reside with Grandfather and his wife for about nine months until March 2023. During that time, the grandparents did not receive any diapers, formula, baby food, clothing, shoes, furniture, or cash from Father, and Father never contacted them to offer any financial support. Father was aware of Grandfather's address, having been there many times, and knew how to contact Grandfather. Grandfather never told Father that they did not want financial support.

{¶ 22} On cross-examination, Grandfather admitted that there was "an issue" between him and Father in June or early July 2022. He described it as "quite heated," but he did not remember what had been said; he did recall that the Sheriff had been called to the home over the "issue." Grandfather stated that if his wife had not paid the initial

rent at the rental property, Mother and Father "wouldn't have been there."

{¶ 23} Petitioner A.N.R., Mother's sister, testified that the child came to live with her and her husband in April 2023. Since that time, A.N.R. had not received any form of financial support from Father, such as clothes, shoes, or food for the child, and he had not made contact with her to offer any. According to A.N.R., Father knew how to reach her, and she never told him that she did not want his support for the child. A.N.R. did not know if Father knew the child was living with her. Mother never delivered any items for the child on behalf of Father.

{¶ 24} The child's maternal grandmother ("Maternal Grandmother") testified that, after being released from the hospital, the child resided with Mother at the rental property for less than two weeks. She testified that she and her husband had paid the deposit and first month's rent there, but she did not remember how the payment was made. Father had stopped by her home one time when he and Mother "were breaking up or something was going on in their relationship," and he stated that he was "scared to death" that he was going to have to pay child support. According to Maternal Grandmother, he absolutely did not want to pay child support. Maternal Grandmother stated that Father had moved out of the rental property in July 2022.

{¶ 25} Father testified that he and Mother became a couple in September 2021. He stated that there was never any question that he was the father of the child. When the child was born, Father and Mother resided together in an apartment in Greenville; both of them were working and paid the bills. The child was born early and remained hospitalized from March until June 7, 2022. Father and Mother visited the child at the

hospital every day after work. Both of their parents and Father's siblings also visited the child. Father and Mother moved into the rental property in Laura at the beginning of May 2022. Father's mother came for two days when they brought the child home to help them. He moved out of the rental property in the middle of June.

{¶ 26} Father testified that, on Father's Day 2022, he had visited with the child at the rental property for about an hour; Father held the child and spent some time with him. Father left when Mother's "dad and brothers came in with their cars and * * * were revving their engines trying to intimidate" him, he guessed. That was the last time Father saw the child.

{¶ 27} Father denied taking the breast pump when he moved out. He testified that he left the rental property after coming home from work to find that Mother was not properly caring for the child; Father went directly to Mother's parents' house to speak to them. He then lived with his uncle for a month before getting his own place. Father acknowledged that Exhibit B reflected his text messages with Mother beginning on June 15, 2022, when he left the rental property they had shared. Father testified that he was trying to reach Mother to see the child, and at times Mother led him to believe there was a possibility of getting back together. Father did not know that the child was living with the child's grandparents at that time. Father stated that he went to Grandfather's house in mid-June, and Grandfather grabbed him and threatened him. Father denied telling Mother's sister or anyone else that he did not want to pay child support.

{¶ 28} Father did not seek to establish his parental rights in court because the "circumstances were unsure" and he thought they "might end up being a family again."

Father was also unable to afford an attorney.   He was living alone at the time, and he did not know the child was living with Petitioners.

{¶ 29} Father stated that he brought more to the child than "suckers and candy and stuff" on the holidays after he and Mother broke up, namely a "boatload of gifts," including food, clothes, wipes, and toys.   Father testified that his mother and sister went with him to the rental property on one occasion; he wanted to "make sure [the child] knew that he had a father" who cared, and he didn't "want to disappear * * * like I think that they thought I was going to."   When no one answered the door, they left the gifts for the child. Mother thanked him twice.

{¶ 30} Father testified that he had never received communication from Petitioners that they wanted to adopt the child.   He was served with the petition for adoption on June 1, 2023.   With respect to establishing child support, Father stated he went to Job and Family Services and was told he needed to go to court, but when he went to court, he was sent back to Job and Family Services; he started the process before April 2023, and he actually filed on April 30, 2023.   Father stated that Mother never asked him for child support, and she did not advise him that she was thinking of surrendering the child to Petitioners.

{¶ 31} On cross-examination, Father agreed that, although there was no child support order, he was employed and had the ability to support the child.   He stated that he had provided Graco formula for the child and had been unaware that the only formula the child could take was Abbott brand, due to having been premature.   Father stated that he and Mother lived together in May 2022 and visited the child in the hospital from May

until June 7, 2022.

{¶ 32} Father's mother ("Paternal Grandmother") testified and corroborated Father's testimony about providing gifts for the child. Paternal Grandmother testified that Mother did not allow Father to have contact with the child, but she and Father had delivered gifts for the 4th of July, Halloween, Thanksgiving, Christmas, Valentine's Day, the child's first birthday, and Easter. They had also delivered wipes, clothing, baby food, and shoes. Paternal Grandmother stated that Mother's car had been in the driveway but no one had answered the door, so they left the gifts and Father photographed them. Paternal Grandmother acknowledged that she did not know of any monetary support provided by Father for the child. She was with Father when the items for the child were purchased, and he paid for them.

{¶ 33} Father's sister testified that she was present with Father twice when he delivered gifts for the child at the rental property -- for Christmas and the child's birthday. The gifts were "Toy Story stuff" and a card for his birthday; for Christmas, they gave money, candy, baby food, and Christmas ornaments, clothes, diapers, and wipes, "[t]hings that a baby would need." According to Father's sister, Father would gather his presents and put them on Mother's porch, and she took a video of him doing so; no one responded to Father's knocks on the door, although there were cars in the driveway. Father paid for the items. Father's sister did not know how much money Father put in the card.

{¶ 34} On rebuttal, Mother testified that Father had not really wanted to go with her very often to visit the child after his birth; they went "[m]aybe once a week." The doctors

and nurses had recommended skin-to-skin contact with the child for at least an hour at each visit. She testified that, if Father accompanied her to the hospital, they would only stay 30 to 45 minutes because Father did not want to stay longer. Mother also testified that the child was on a specific formula for premature infants, and Father never purchased any, she also stated that no clothing, wipes, or diapers were ever included in Father's gifts.

### Probate Court Decision

{¶ 35} In ruling on the petition for adoption, the probate court noted that Petitioners alleged both that Father had failed to provide more than de minimis contact with the child and to provide for his maintenance and support. These are reasons set forth in R.C. 3107.07(A) why a parent's consent to adoption is not required.

{¶ 36} The court first addressed the alleged lack of maintenance and support, finding that the "operative period of time" was from April 27, 2022, to April 27, 2023, the date the petition for adoption was filed. The court noted that Petitioners' arguments focused on the fact that Father had not paid child support or initiated a support order and that Mother's relatives had paid the deposit and rent for Mother and Father's rental property home. The court noted that when the child was born in late March 2022, Mother was his legal custodian, and she remained so when the parties separated in mid-June. From that time forward, neither party, "at least initially," commenced custody or support proceedings. Looking back to April 27, 2022, when Mother and Father resided together in Greenville and the child was still in the hospital, the court noted that Mother and Father were visiting with the child, preparing for him to come home, and preparing to move into

a different residence, which they did a short time later. When the child did come home on June 7, 2022, the family lived together for between one and two weeks, and Father was employed at Fram.

{¶ 37} The probate court found that, for the period of time between April 27 and mid-June 2022, Mother and Father had supported the child together as a couple as they prepared to bring him home, and there was no need for a child support order during that period. There was also no need for either of the parents to keep financial records of their expenditures on the child during that period. The probate court concluded that "these circumstances alone constitute[d] meaningful maintenance and support" by Father for his child. According to the court, Petitioners were required to show that Father had provided no maintenance and support for the entire year preceding the filing of their petition by clear and convincing evidence, and that period had included the time period from April to June 2022 that Father and Mother had lived together.

{¶ 38} The court further found that, although Petitioners focused on the payments of the deposit and rent at the rental property, those were not the only expenses that Father and Mother would have paid during that period. The court found that Petitioners had not addressed additional expenses, such as "food, utilities, gas for trips to visit the child, etc." Further, the court found that even if the deposit and rent had been the only relevant expenses, Petitioners had failed to prove by clear and convincing evidence that Father did not pay them; no documents were provided by any witnesses to establish the payments, and "[n]either side established their contention by clear and convincing evidence." The court concluded that Petitioners had failed to meet their burden as to

maintenance and support.

{¶ 39} Regarding Father's contact with the child, the probate court also found that Petitioners had failed to meet their burden. The court found that from April 27 to June 7, 2022, Mother and Father had visited the child in the hospital, although they disagreed about the frequency of Father's visits. According to the court, "even accepting [Mother's] testimony as true, [Father] visited the child once per week during this period of time." The court further found that, beginning June 7, 2022, Mother, Father, and the child had resided together as a family. Although no specific date was given when Mother moved out, she testified that they all lived together "at least a week and no more than two weeks." The court found that this period of time, while brief, was more than de minimis contact.

{¶ 40} The court found that Exhibit B, documenting the text messages between Mother and Father, showed that Mother and Father had "communicated consistently" after their separation and that Father had frequently asked to visit with the child in his texts, "including up to just a few weeks before the Petition for Adoption was filed." The court found the texts significant in the following ways: the texts included references to gifts Father had left for the child; there was one acknowledgment of such gifts from Mother; and all of the texts were consistent with Father's testimony that he wanted to see his child and was hopeful for a reconciliation with Mother. Although the court noted that it did not need to address justifiable cause, it observed that it likely would have ruled in Father's favor on justifiable cause for failure to contact the child based upon the text communications and Father's continuous efforts to see the child.

{¶ 41} Based on these findings, the court concluded that Father's consent to the

adoption was needed and denied Petitioners' petition for adoption.

## Arguments

{¶ 42} On appeal, Petitioners assert that the probate court's finding that Mother and Father moved into the rental property on Red River-West Grove Road on June 1, 2022, when the evidence demonstrated that they in fact moved into the residence on May 1, 2022, was "particularly problematic," because the court seemed to rely heavily on the fact that the parties were together as a couple and paying bills in Greenville. According to the Petitioners, when Mother and Father moved to the rental property on May 1, 2022, Father "failed to contribute to any of the household expenses, including rent, and groceries, etc."

{¶ 43} Petitioners further argue that "Ohio Courts have routinely held that de minimis gifts from a biological parent to a minor child do not constitute maintenance and support" that triggers the statutory requirement of a parent's consent to an adoption, "as such gifts are not payments as required by law or judicial decree." Petitioners contend that Father provided no documentary proof that he purchased such items as formula or diapers. They argue that the evidence at the consent hearing demonstrated that there was no justifiable cause for such failure.

{¶ 44} Petitioners assert that the probate court abused its discretion in finding that Father provided maintenance and support for the child within the requisite one-year period. According to Petitioners, the probate court merely assumed that, because Mother and Father were briefly a couple during that time, Father must have provided some form of support.

{¶ 45} Finally, Petitioners argue that the probate court abused its discretion in finding that Father's contact with the child between June 7, 2022, and June 15, 2022, was more than de minimis. Petitioners note that the probate court cited no case law in support of its decision, and they note that, after Mother and the child left the rental property, Father only saw the child once within the requisite period, which was on Father's Day, June 19, 2022.

{¶ 46} In response, Father asserts that it is "obvious" that he provided maintenance and support for the child within the one-year look-back period from the filing of the petition for adoption. He argues that, from the child's birth until the child came home from the hospital, he was driving to Dayton several times a week with Mother to see their child, and he was kept from seeing the child "by many parties" from Father's Day 2022 until the petition for adoption was filed, as demonstrated by Mother and Father's texts.

{¶ 47} In reply, Petitioners argue that Father's primary concern was reconciling with Mother and not the child's welfare, and they point out that the probate court did not consider justifiable cause in its decision.

### Applicable Law

{¶ 48} R.C. Chapter 3107 governs adoption. "A parent has a fundamental right to care for and have custody of his or her child." *In re Adoption of K.C.*, 2d Dist. Montgomery No. 22243, 2008-Ohio-2593, ¶ 10. While, pursuant to R.C. 3107.06, a biological parent ordinarily must consent before a court may grant an adoption petition, R.C. 3107.07(A) provides exceptions to that requirement. *In re Adoption of D.W.D.-H,* 2d Dist. Clark No. 2023-CA-8, 2023-Ohio-1999, ¶ 14. R.C. 3107.07 provides, in relevant

part:

Consent to adoption is not required of any of the following:

(A) A parent of a minor, when it is alleged in the adoption petition and the court, after proper service of notice and hearing, finds by clear and convincing evidence that the parent has failed without justifiable cause to provide more than de minimis contact with the minor or to provide for the maintenance and support of the minor as required by law or judicial decree for a period of at least one year immediately preceding either the filing of the adoption petition or the placement of the minor in the home of the petitioner.

{¶ 49} "The party petitioning for adoption has the burden to prove by clear and convincing evidence that one of two consent exception applies," namely that the parent has failed, without justifiable cause, to have more than de minimis contact with the child *or* to provide maintenance and support for the child for at least the one-year period immediately preceding the filing of the adoption petition. *Id.* at ¶ 15. "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 50} Once the petitioner establishes one of the exceptions, "the burden of going forward with evidence shifts to the biological parent to show some facially justifiable cause

for the failure." *D.W.D.-H* at ¶ 15, citing *In re Adoption of Bovett,* 33 Ohio St.3d 102, 515 N.E.2d 919 (1987), paragraph two of the syllabus. The "burden of proof, however, remains at all times with the petitioner, who must prove the lack of justifiable cause by clear and convincing evidence." *Id.*, citing *Bovett* and *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985) ("No burden is to be placed upon the non-consenting parent to prove that his failure to communicate was justifiable.").

The phrase "justifiable cause" is not defined in R.C. 3107.07. However, it has been defined as meaning "[c]apable of being legally or morally justified; excusable; defensible." (Citations omitted.) *In re Adoption of B.I.*, 2017-Ohio-9116, 101 N.E.3d 1171, ¶ 10 (1st Dist.), *aff'd*, 157 Ohio St.3d 29, 2019-Ohio-2450, 131 N.E.3d 28. The Ohio Supreme Court has "refused to adopt a 'precise and inflexible meaning' for 'justifiable cause,' but instead has concluded that 'the better-reasoned approach would be to leave to the probate court as finder of fact the question of whether or not justifiable cause exists.' " *In the Matter of Adoption of D.D.G.*, 2d Dist. Montgomery No. 27741, 2018-Ohio-35, ¶ 5, quoting *In re Adoption of W.K.S.*, 2d Dist. Champaign No. 2014-CA-16, ¶ 22, citing *Holcomb* at 367. An important consideration regarding justifiable cause is a parent's willingness and ability to contact or support a child. *In re Adoption of J.R.I.*, 2023-Ohio-475, 209 N.E.3d 93, ¶ 38 (2d Dist.), citing *In re Adoption of Masa*, 23 Ohio St.3d 163,166, 492 N.E.2d 140 (1986).

Whether a biological parent has failed to have more than de minimis

contact with or has failed to provide maintenance and support for a child involves a trial court's resolution of questions of fact and is subject to abuse-of-discretion review. *In re Adoption of M.B.*, 131 Ohio St.3d 186, 2012-Ohio-236, 963 N.E.2d 142, ¶ 21. A trial court's justifiable-cause determination regarding a biological parent's failure to do these things will not be disturbed unless that determination is against the manifest weight of the evidence. *Id.* at ¶ 24, quoting *Masa*, paragraph two of the syllabus. This standard requires us to weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the court clearly lost its way and created a manifest miscarriage of justice. *In re Adoption of J.L.*, 1st Dist. Hamilton No. C-180453, 2019-Ohio-366, ¶ 25.

*D.W.D.-H* at ¶ 16-17. We will address the statutory requirements in the order addressed by Petitioners, followed by a brief discussion of justifiable cause.

Maintenance and Support

{¶ 51} To determine whether a parent has failed to provide for the support and maintenance of a child, the probate court uses a three-step process. *In re Adoption of F.D.H.*, 2013-Ohio-730, 210 N.E.3d 59, ¶ 21 (2d Dist.). "First, it must determine what the law or judicial decree required of the parent during the year preceding the filing of the adoption petition." *Id.,* citing *In re Adoption of A.K.*, 168 Ohio St.3d 225, 2022-Ohio-350, 198 N.E.3d 47, ¶ 14. Upon resolution of this preliminary step, "the court must decide if the parent met his or her obligation under the law or judicial decree." *Id.*, citing *A.K.* at

¶ 14. "Finally, if the obligation was not met, the court must decide whether there was a justifiable cause for that failure." *Id.*

{¶ 52} While R.C. 3107.07(A) defines maintenance and support as that required by law or judicial decree, R.C. 3103.03(A) further provides: "The biological or adoptive parent of a minor child must support the parent's minor children out of the parent's property or by the parent's labor." " 'Such duty of support is not dependent upon the presence or absence of court orders for support.' " *In re Adoption of K.L.M.*, 10th Dist. Franklin No. 15AP-118, 2015-Ohio-3154, ¶ 12, quoting *In re Adoption of B.M.S.*, 10th Dist. Franklin No. 07AP-236, 2007-Ohio-5966, ¶ 23, and citing *Nokes v. Nokes*, 47 Ohio St.2d 1, 5, 351 N.E.2d 174 (1976). In other words, there is a common-law duty of support in addition to support ordered by judicial decree, and a judicial decree of support "simply incorporates the common-law duty of support." *In re Adoption of McDermitt*, 63 Ohio St.2d 301, 305, 408 N.E.2d 680 (1980). "Such a duty of support is not dependent upon the presence or absence of court orders for support." *K.L.M.* at ¶ 12, citing *Nokes* at 5; *B.M.S.* at ¶ 23.

"Maintenance and support, in the adoption context, do not simply refer to child support payments or other monetary contributions." *Id.* at ¶ 15, citing *In re Adoption of McNutt*, 134 Ohio App.3d 822, 829, 732 N.E.2d 470 (4th Dist.1999). "Maintenance and support, 'may mean any type of aid to feed, clothe, shelter, or educate the child; provide for health, recreation, travel expenses; or provide for any other need of the child. * * * Supplying shoes, diapers, or any other clothing can constitute support and

maintenance.' " *Id.*, quoting *In re Adoptions of Groh*, 153 Ohio App.3d 414, 2003-Ohio-3087, 794 N.E.2d 695, ¶ 20 (7th Dist.2003). *K.L.M.* at ¶ 15. "De minimis monetary gifts from a biological parent to a minor child do not constitute maintenance and support, because they are not payments as required by law or judicial decree as R.C. 3107.07(A) requires." *In re Adoption of M.B.,* 131 Ohio St.3d 186, 2012-Ohio-236, 963 N.E.2d 142, at ¶ 20.

{¶ 53} We agree with the probate court that Petitioners did not establish, by clear and convincing evidence, that Father had failed to provide maintenance and support for the child for the relevant one-year period before the petition. Although there were inconsistencies in the testimony regarding the timeline of events during the one-year period, the parents lived together in Greenville at the time of the child's birth in March 2022, and they continued to live together when they moved into the rental property on Red River-West Grove Road. The evidence supported the court's conclusion that this move occurred at the beginning of May 2022, not June, as it was undisputed that the deposit and rent for the months of May and June 2022 were paid. The child came home on June 7, 2022. The testimony and the text communications in Exhibit B demonstrated that Mother and Father ended their relationship around June 15, 2022; Father left the rental property, and Mother moved into her parents' home with the child at that time. Mother then returned to the rental property around July 1, 2022, and the child remained with her parents for nine months until being placed with Petitioners in April 2023.

{¶ 54} As the probate court noted, how the deposit and rent for May and June were paid at the rental property was not established. We note that the court erroneously

imposed a burden upon Father when it found that "[n]either side established their contention [regarding the rent and deposit] by clear and convincing evidence." Petitioners had the burden of proof. However, this error was harmless, as we find no abuse of discretion in the probate court's determination that Petitioners did not prove that Father had failed to provide maintenance and support for the child for the year preceding the filing of the petition. The evidence established that the parents lived together as a couple and were supporting the child as a couple after the child's birth and from April 27 until the middle of June 2022, either in Greenville or at the rental property. Father was employed at Fram during that time. We agree with the probate court that these circumstances alone constituted meaningful maintenance and support by Father for his child.

### More than De Minimis Contact

**{¶ 55}** When applying the contact prong of R.C. 3107.07(A), the probate court employs a two-step process. *In re Adoption F.D.H.,* 2013-Ohio-730, 210 N.E.3d 59, at ¶ 7, citing *In re Adoption of J.R.I.,* 2023-Ohio-475, 209 N.E.3d 93 (2d Dist.). "First, it must decide whether the parent has failed to have more than de minimis contact." *Id.,* citing *In re Adoption of M.M.R.,* 2d Dist. Champaign No. 2017-CA-12, 2017-Ohio-7222, ¶ 7. "If the probate court determines that the parent failed to have more than de minimis contact, the next step is to determine whether justifiable cause for the failure has been proven by clear and convincing evidence." *M.M.R.* at ¶ 8.

While not statutorily defined, "more than de minimis contact" implies

contact—either attempted or successful—beyond a single occurrence. *In*

*re J.D.T.*, 2012-Ohio-4537, 978 N.E.2d 602, ¶ 9 (7th Dist.). That is, the statute demands "more quality and quantity" and requires "more effort from the parent to have contact and communication with the child" than is shown by one-time contact. *In re Adoption of K.A.H.*, 10th Dist. Franklin No. 14AP-831, 2015-Ohio-1971, ¶ 10. * * *

*In re Adoption of T.U.*, 2020-Ohio-841, 152 N.E.3d 943, ¶ 25 (6th Dist.).

{¶ 56} As discussed above, Father had regular contact with the child from April 27, 2022, until his relationship with Mother ended in mid-June 2022. We see no abuse of discretion in the trial court's determination that Father's contact with the child during this period was "more than de minimis contact."

Justifiable Cause

{¶ 57} Finally, because the probate court reasonably concluded that Petitioners had failed to establish by clear and convincing evidence that Father failed to provide maintenance and support for the child or to provide more than de minimis contact with the child within the year prior to the filing of the petition for adoption, it properly concluded it did not need to address justifiable cause. The court nevertheless found that Exhibit B supported a finding of justifiable cause, and we agree. Exhibit B reflects that, beginning on June 15, 2022, Father texted Mother asking to "put our family back together." From June 2022 through April 1, 2023, Father repeatedly asked on the texts about the child's welfare and to see him, accused Mother of keeping the child from him, asked to see a picture of the child, asked to attend a doctor's appointment and offered money for gas to get there, asked to meet Mother so he could see their son, asked about the child's weight

and health, and said he missed the child "so very much." On March 13, 2023, Father asked to meet Mother to see the child, stating that he would "accommodate to whatever works for you." On March 29, 2023, Father texted, "It's been a year since our son * * * came into this word I know you know just wanted to stay in contact I hope all is well call me anytime I hope to hear from you how is he would love to hear about his progress." The probate court reasonably found that Mother had thwarted Father's multiple efforts to have contact with the child, and Exhibit B corroborated Father's testimony that Mother led him to believe that their reconciliation was not foreclosed. As noted above, an "important consideration regarding justifiable cause is a parent's willingness and ability to contact or support a child." Further, more than de minimis contact refers to not only successful, but also attempted, contact beyond one occurrence. Although Father could have done more to assert his rights, the burden of proof remained on Petitioners.

{¶ 58} Based upon the foregoing, Petitioners' assignments of error are overruled.

{¶ 59} The judgment of the probate court is affirmed.

. . . . . . . . . . . .

WELBAUM, J. and TUCKER, J., concur.