[Cite as *In re Adoption of G.A.J.-K.*, 2025-Ohio-1276.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MIAMI COUNTY

IN THE MATTER OF: THE ADOPTION    :
OF G.A.J.-K.    :
    :    C.A. No. 2024-CA-24
    :
    :    Trial Court Case No. 20245017
    :
    :    (Appeal from Common Pleas Court-
    :    Probate Division)
    :
    :

. . . . . . . . . . .

O P I N I O N

Rendered on April 11, 2025

. . . . . . . . . . .

JAY M. LOPEZ & CHARLYNE L. ADAMS, Attorneys for Appellant

WILMER J. DECHANT, JR., Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} Stepfather appeals from the probate court's order granting a directed verdict in favor of Father on Stepfather's petition to adopt G.A.J.-K. ("the child"). For the reasons that follow, the probate court erred in granting a directed verdict in favor of Father on the issue of whether his consent to the child's adoption was required. The judgment of the

probate court will be reversed, and the matter will be remanded for further proceedings consistent with this opinion.

**Facts and Procedural History**

{¶ 2} On May 15, 2024, Stepfather filed a petition to adopt the child, who was born in 2013. The child's mother was married to Stepfather, had custody of the child, and consented to the adoption. The petition stated that Father's consent was not required because he had "failed without justifiable cause to provide more than de minimis contact with the minor for a period of at least one year immediately preceding the filing of the adoption petition."

{¶ 3} A hearing to determine whether Father's consent to the adoption was required occurred on August 12, 2024. The following evidence was presented at the hearing.

{¶ 4} Father testified, as on cross-examination, that he had lived in Kettering since March 2024 with his 3-year-old son, his girlfriend Kayla, and Kayla's two-year-old daughter. He had also lived in Tipp City with a previous girlfriend, Taylor, during the year preceding the filing of the adoption petition. Father admitted that he had not had in-person contact with the child who was the subject of the adoption petition since May or June 2023, when he saw her at his mother's house; he did not recall the length of that visit. He also acknowledged that he had not had any phone, email, or social media contact with the child since May 15, 2023.

{¶ 5} Father stated that he had previously contacted the child via Facebook Messenger. He acknowledged that, during the year in question, he had been aware of

the child's residential and school addresses. Father also stated that, during that time, Mother had invited him to attend one event, when she and the child "were going to the pool." However, Father then acknowledged text messages in which Mother had invited him to a birthday party on July 8, 2023, and to go on a boat ride with the child the following day. Father acknowledged that Mother had not prevented him from attending the events and that he had stated he would attend the events, but he chose not to do so. Father also testified that he did not know which church the child regularly attended, and he denied that Mother had given him that information, but he then acknowledged text messages dated April 9 and April 30, 2023, in which Mother had sent him the address of the church.

{¶ 6} He stated that, as of May 16, 2023, he and Mother had an agreed upon parenting schedule of "every other week," although there was no court order in place; according to Father, he had C.A.J.-K. certain days during his weeks, which coordinated with the days he had his other child. Father did not recall when he had last exercised his parenting time.

{¶ 7} Father was questioned about specific text message exchanges with Mother. One of these exchanges suggested that Mother would only allow the child to go with Father if Taylor was present, but Father denied that Mother had required his parenting time to be supervised by Taylor or that he had ever agreed to that. Father also acknowledged that, "as of August 4, 2023," he had had one in-person visit with the child and no other contact; on that date, he also posted on Facebook "ever notice how peaceful life is since you stop dealing with certain individuals[?]"

{¶ 8} Father had an altercation in May 2023 with his girlfriend Taylor; it resulted in Father pleading guilty to disorderly conduct on August 17, 2023. Father was aware that he had been blocked from Mother's phone after his criminal case involving Taylor. Father identified a text message from the day of his plea, sent at 4:49 p.m., in which Mother had accused him of screaming at her; Father agreed that it was reasonable to assume that Mother had been at work at the time, because she worked five days a week. When asked if he had called Mother at work and told her to stay out of his business with Taylor, Father stated that he only "got involved" after Mother called Taylor. He acknowledged raising his voice and said that Mother had blocked his cell phone number that day. He also admitted that, before June 30, 2023, Mother had repeatedly asked him to stop calling her on her cell phone while she was at work, and he did not remember if he had complied with this request.

{¶ 9} Father acknowledged that there was an agreed order related to child support dated May 2, 2023; that order specified that Father was prohibited from requesting a modification of child support for three years. Mother admitted into evidence a complaint Father had filed on April 29, 2024, to allocate parental rights and responsibilities and for parenting time. Mother's attorney represented to the court that, in the juvenile court proceedings related to that filing, Father had also requested a modification of child support, but the juvenile court did not address the request for modification of child support because of the agreed duration of the parties' 2023 order. Father admitted that he had requested the modification of child support in April 2024 because he wasn't able to make the child support payment in the prior order and was "backed up" with an arrearage of

$4,092.27.

{¶ 10} Father testified that he had not had any contact with Stepfather between May 15, 2023, and May 15, 2024, because Father was trying to work through Mother. Father acknowledged that he had told Mother "you don't f…ing know about a damn thing your Karma is coming soon bitch," and called her a "leach." Father denied that Mother had expressed concern to him about his cocaine usage. When shown a text message in which Mother mentioned his alleged drug use, he stated, "She obviously stated that in the text messages, yes." Father denied abusing "non-prescribed" Adderall and stated that he had had a prescription for Adderall for over a year.

{¶ 11} Brooke Sparks testified that she was the child's godmother and had last had contact with Father at a church festival in Vandalia in the fall of 2023, when she went there with her own children, Mother, and G.A.J.-K. Father had also been present with his mother and was "off to the side" watching the child on a ride. Father told Sparks that he did not want to be there because he had other plans.

{¶ 12} Stepfather testified that he had known the child since March 2018. He and Mother were married in June 2021. Stepfather had last had contact with Father in September 2023 via text message. According to Stepfather, he "accidently butt dialed" Father, and Father texted him back to ask if everything was all right; Stepfather responded yes. Stepfather stated that he had not blocked Father on any social media.

{¶ 13} The child's soccer coach testified that she had had no contact with Father during the relevant time period and had never observed him at any of the child's practices or games during that time. The coach had known Father for ten years, and they had

each other's cell phone numbers, but she had never received communication from Father regarding the child. She testified that she thought he would have felt comfortable enough to reach out to her about sports or anything else related to the child.

{¶ 14} Mother testified that Father saw the child once during the relevant period at the church festival on June 9, 2023; she denied that Father saw the child at his mother's home in June 2023. Between May 15, 2023, and May 15, 2024, Mother asked Father to attend events with the child but he did not do so, and he often contacted her at her work after she repeatedly asked him not to do so. Mother worked 8:00 a.m. to 5:00 p.m., and when called by Father during that time, she told him she was at work. According to Mother, they discussed various things, including the child and Father's "domestic violence," but Father never scheduled parenting time with the child.

{¶ 15} Mother testified that, if parenting times were ever arranged, Father did not attend. For example, Mother stated that she invited Father to the home of Stepfather's father for a birthday party, to Land of Illusion for Father's Day, to go on a boat ride twice with the child, and to meet for dinner with his grandmother when she was visiting. According to Mother, Father did not follow through on what he said he would do and did not attend any of the visits Mother attempted to arrange. For his part, Father also never attempted to arrange a visit with the child himself during the relevant time period.

{¶ 16} According to Mother, Father had recently deleted her on Instagram and blocked her on Facebook. Between August 2023 and May 2024, Mother did not offer Father any parenting time other than the occasions discussed above and did not have any communication with him. Father also did not request any parenting time during that

period.  According to Mother, if Father had found a means to communicate with the child, she would have allowed him to have access to the child "in a safe environment."  She did allow the child to interact with Father's family, and Father could have had access to the child then.  Mother testified that Father's sister and brother-in-law took the child to Steak and Shake and skate boarding in the summer of 2023, Father's sister came to a soccer practice in the fall of 2023, and Mother and the child met Father's brother and sister at McDonald's and spent the day with them in November 2023.  Mother did not receive communication from any of Father's family members requesting parenting time on Father's behalf.

{¶ 17} Mother testified she knew where Father lived during the relevant period and would not have allowed the child to spend the night there, although Father did not invite the child to do so or attempt to arrange any such visit.  Mother expressed concern about the child's safety in the company of Father and Kayla.

{¶ 18} Mother acknowledged that she let the child spend the night at Father's Tipp City address before May 2023, when he resided with Taylor, but she did not do so after May 15, 2023.  According to Mother, there was an incident in which the child had gone to Father's house and then called Mother crying and saying that she wanted to come home, because she had tried to show Father her school project but he had rushed her and yelled at her.  Mother stated that the child also had told her that her paternal grandfather made her uncomfortable.

{¶ 19} Mother stated that being contacted by Father while she was at work had caused her "severe anxiety and PTSD"; he had screamed and cursed at her over the

phone while she was at work. Mother also testified that the child had had panic attacks in Father's care. She stated that the child did not receive a Christmas present from Father in 2023.

{¶ 20} On cross-examination, Mother acknowledged that in February 2023, she had told Father to communicate with her only via text messages; however, she had taken numerous phone calls from him after that time. Mother stated that she did not want Father to have unsupervised time with the child for the child's safety. She acknowledged that there was no court order restricting Father's parenting time, and she had not sought one. The record does not reflect any specific parenting time order for Father during the relevant time period.

{¶ 21} Mother identified a July 5, 2023 text message she sent to Father in which she stated that she would not force the child to be around him or his father if the child did not feel safe. According to Mother, when Father did ask to see the child, Mother would offer an alternative in which others could be around, so the child felt comfortable, but then Father wouldn't come. She acknowledged that she "always" placed restrictions on Father. Mother allowed Father to speak to the child directly, and she had the child call Father on his birthday. According to Mother, the child "made a big deal" about Father asking her about school even though she had been out of school for weeks at that point.

{¶ 22} Mother stated that G.A.L.-K. had her own cell phone. Nonetheless, Father would call Mother's phone when Mother was at work or when the child was in bed. Mother stated that Father had called the child (on Mother's phone) during the year preceding the filing of the petition at 9:00 p.m., when the child was sleeping, and then he

would not answer when the child called him back. Mother told Father that the child had a bedtime. She also testified that she always told G.A.L.-K. if Father had called. When asked if she admitted that Father made contact with the child, Mother responded, "During the relevancy period before I blocked him, yes."

{¶ 23} With respect to her safety concerns, Mother testified that she imposed conditions on Father's parenting time because Father would drink and drive with the child and get in fights with his girlfriends in front of the child. He had also left the child at "Get Air" (a trampoline park) on a Saturday night when she was 9 years old, and Get Air had contacted Mother because the child had been "crying and freaking out," had approached a detective, and had tried to find her father after he said he would be right back but had been unable to find him. According to Mother, that was the last time Father had had contact with the child without anyone else around.

{¶ 24} Mother stated that Father last saw the child in June 2023, at a festival, and that the child last talked with Father by phone in July 2023 on Father's birthday. According to Mother, when the child was in therapy, Father referred to the therapist as "the B word" and accused Mother of "putting things in [the child's] head." The child stopped counseling in October 2023; she no longer had anxiety or panic attacks at that time because she hadn't been around her father. Mother testified that the child did not want to be around her grandfather and had made statements that her grandmother "enables her father and grandfather."

{¶ 25} Mother stated that she had not made any efforts to reestablish a relationship between Father and the child, because she did not believe that was her "job" and because

the child "has been the best mentally she has ever been" in the year preceding the hearing. Mother testified that she had invited Father to some things despite the fact that G.A.J.-K. did not want him to come. Mother testified that the child has not asked to see Father since the end of August 2023. She also recounted that, when she had had the child call Father on his last birthday, the child had wished Father a happy birthday, but then Father handed the phone to his father, and the child "got off the phone while making faces." According to Mother, the child had stated that Father lied all the time and didn't follow through on things he said he would do, and this "stressed [the child] out" and made her sad.

{¶ 26} Mother testified that, after the July 5, 2023 text messages, she gave Father many opportunities to see the child, but he never did so. Mother had expressed concerns to Father about domestic violence, his cocaine use, lack of stable housing, and the child's panic attacks. Mother stated that she would have allowed Father to see the child in the year preceding the filing of the petition, but not alone. She also testified that Father had never attempted to contact the child directly on the child's cell phone or email; Father only attempted to contact the child by means of Mother's cell phone.

{¶ 27} At the end of Mother's testimony, the probate court clarified the following points in an exchange with Mother: from May to August 2023, Father had made phone calls to and texted Mother regarding the child; Father sometimes called when the child was sleeping, and the child would call back the next day but Father did not answer; and Father had talked with the child on Father's birthday.

{¶ 28} Stepfather also called Officer Jared Bailey, a patrol officer with the Huber

Heights Police Department, to testify at the hearing. He stated that, on May 28, 2023, he had been dispatched to a "domestic case" at a cookout involving Father and Father's then-girlfriend, Taylor; Taylor reported that she had found cocaine in Father's wallet, and an argument had ensued. Taylor left the gathering, leaving their child with Father. When she returned to pick up the child, Father was talking to another woman, and a second argument ensued. Taylor reported that Father had grabbed her and thrown her down. Bailey photographed her injuries. According to Bailey, Taylor reported that she and Father lived in Tipp City, but Tipp City police were unsuccessful in contacting Father. Although Taylor reported that Father had possessed cocaine, none was found.

{¶ 29} At the conclusion of Stepfather's evidence, Father's attorney moved for a directed verdict. Father's attorney argued that he had had at least some contact with the child during the relevant time and that Mother had substantially interfered with his attempts to have contact with the child. Stepfather's attorney responded that Mother had facilitated contact but any contact that occurred was minimal and that Mother had had legitimate concerns for the child's safety. The court took the motion for directed verdict under advisement.

{¶ 30} On September 18, 2024, the probate court granted Father's motion for a directed verdict and dismissed Stepfather's petition for adoption. It found that Stepfather had not established by clear and convincing evidence that Father failed to have more than de minimis contact with the child without justifiable cause. Specifically, the trial court concluded that there was justifiable cause for Father's limited contact due to Mother's interference. The court noted that the petition had been filed three weeks after

Father filed a complaint for custody and allocation of parental rights and responsibilities in the juvenile court. The court also noted that Mother and Father had agreed to an every-other-weekend parenting schedule in May 2023, but almost immediately, Mother had required supervised visitation. The court found that, during the one-year prior to the filing of the petition, Mother admitted that she had gotten text messages from Father wanting to see the child, the child had called and talked with Father (for his birthday), and Father had sometimes called after 9:00 p.m. and Mother would not let him speak to the child, but the child would attempt to call him back. Mother had also blocked Father on her cell phone and told him not to call her at work. Father had seen the child in person at a festival in June 2023.

{¶ 31} The court found that Mother admitted there had been texts and phone calls between Father and the child between May and August 2023.[1] The court found that, because of concerns about Father's rumored cocaine use, Mother had made efforts to keep Father away from the child during the one-year period prior to the filing of the petition.

{¶ 32} The court stated that, in examining whether the parent's failure to have contact was justified, "the court is not restricted to focusing only on events occurring during the statutory one-year period. **The court must also examine preceding events having any bearing on the parent's failure to communicate with his child.**" (Emphasis in original.) The court also noted that even a parent's complete failure to

---

[1] The trial court's judgment entry states that there were phone calls and texts between Father *and the child* during this period, Judgment Entry at ¶ 7, but Mother's testimony was that there was contact between Father and *Mother* during this time, except for the child's call to Father on his birthday. Tr. p. 83, 87.

contact a child will not eliminate the need for the parent's consent to an adoption if there was justifiable cause for the failure, and the petitioner bears the burden to show lack of justifiable cause. The court stressed that "[t]**ypically, a noncustodial parent has justifiable cause for failing to communicate when the custodial parent significantly interferes with or significantly discourages communication.**" (Emphasis in original.)

{¶ 33} The probate court applied the three-step analysis set forth in *In re Adoption of B.I.*, 2019-Ohio-2450, which stated:

> The court must first determine what the law or judicial decree required of the parent during the year immediately preceding . . . the filing of the adoption petition . . . . Second, the court determines whether during that year the parent complied with his or her obligation under the law or judicial decree. Third, if during that year the parent did not comply with his or her obligation under the law or judicial decree, the court determines whether there was justifiable cause for that failure.

Id. at ¶ 15.

{¶ 34} Applying this analysis, the probate court found that Father had had some contact with the child in June 2023 through August 2023. Further, the court found that Mother had interfered with Father's relationship with the child by making it clear to him that she felt harassed and blocking him from her phone and social media. The court also noted that Father had filed a complaint to allocate parental rights or for parenting time weeks prior to the filing of the petition for adoption. On these bases, the court concluded that Stepfather had failed to establish by clear and convincing evidence that Father did

not have more than de minimis contact with the child in the year prior to the petition without justifiable cause; in the court's view, Mother's interference constituted justifiable cause for Father's limited contact. The court granted the motion for a directed verdict and dismissed the petition for adoption.

**Assignments of Error and Analysis**

{¶ 35} Stepfather asserts four assignments of error on appeal. His first three assignments of error are related, and we will consider them together.

THE TRIAL COURT ABUSED ITS DISCRETION BY DETERMINING FATHER HAD MORE THAN DE MINIMIS CONTACT WITH THE MINOR CHILD FOR THE YEAR PRECEDING THE FILING OF THE PETITION FOR ADOPTION.

THE TRIAL COURT ERRED WHEN IT DETERMINED THAT FATHER HAD JUSTIFIABLE CAUSE FOR FAILURE TO HAVE DE MINIMIS CONTACT WITH THE MINOR CHILD, AS THE DECISION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND CONTARY TO LAW.

THE TRIAL COURT ERRED AS A MATTER OF LAW BY GRANTING RESPONDENT-APPELLEE'S MOTION FOR DIRECTED VERDICT.

{¶ 36} In his first assignment, Stepfather argues that the trial court should have found that he met his burden of showing that Father failed to have more than de minimis contact with the child in the year preceding the filing of the petition for adoption.

Stepfather asserts that the trial court's judgment entry contains language "which on its face appears contradictory." He asserts that the legislature intended for adoptions to go forward without the respondent's consent even when some communication with the minor child occurred during the relevant period. Stepfather argues that the probate court relied upon an outdated statute and case law.

{¶ 37} In his second assignment of error, Stepfather challenges the probate court's finding that there was justifiable cause for Father's limited contact with the child. He argues that Mother did not block Father from contacting the child directly, as the child had her own phone and email address by which to communicate with Father. Stepfather also asserts that Father knew that Mother had blocked his calls and should have considered other reasonable alternatives, including reaching out to the child directly or to him. He argues that Father's testimony suggests that he was more interested in speaking with Mother than the child. Stepfather notes that Father refused to see the child while supervised. He argues that the probate court should have determined that Father lacked justifiable cause for his failure to have more than de minimis contact with the child.

{¶ 38} In his third assignment of error, Stepfather asserts that there was "clearly enough evidence" favoring his petition and that the trial court's directed verdict was inappropriate.

{¶ 39} Father responds that R.C. 3107.07(A) does not specify that in-person contact is required, just that contact be more than de minimis. He argues that, although his contact with the child was not extensive, it was more than de minimis. While acknowledging that some of his calls were made after 9:00 p.m., they show that he was

trying to reach the child, and he relied upon Mother to let the child know he had called.

**{¶ 40}** Father asserts that Mother's unilateral demand for supervised parenting time, with only his girlfriend Taylor serving as supervisor, constituted substantial interference, and that she did not otherwise facilitate parenting time and his relationship with the child. Father argues that the directed verdict was appropriate because the probate court "could only come to the conclusion that the adoption petition must be dismissed" because Stepfather had failed to meet his burden.

**{¶ 41}** In reply, Stepfather asserts that Father's contact with the child at the festival was "not quality contact with the child" and was not "purposely initiated" by Father. Stepfather also points out that Father never answered the child's calls when she returned his late-night calls the next day. Stepfather reasserts that Mother had legitimate concerns about the child's unsupervised time with Father and that nothing had prevented Father from contacting the child directly, rather than through Mother.

### Applicable Law

**{¶ 42}** R.C. 3107.07 states that consent to adoption is not required of any of the following:

(A) A parent of a minor, when it is alleged in the adoption petition and the court, after proper service of notice and hearing, finds by clear and convincing evidence that the parent has failed without justifiable cause to provide more than de minimis contact with the minor or to provide for the maintenance and support of the minor as required by law or judicial decree

for a period of at least one year immediately preceding either the filing of the adoption petition or the placement of the minor in the home of the petitioner.

{¶ 43} "When construing R.C. 3107.07(A), courts are 'obliged to strictly construe . . . [its] language to protect the interests of the non-consenting parent who may be subjected to the forfeiture or abandonment of his or her parental rights.' " *In re Adoption of M.M.,* 2023-Ohio-397, ¶ 34 (6th Dist.), quoting *In re Adoption of Sunderhaus*, 63 Ohio St.3d 127, 132 (1992). "That is because '[t]he rights to conceive and to raise one's children have been deemed essential, . . . basic civil rights of man, . . . and [r]ights far more precious . . . than property rights.' " (Internal citations omitted.) *Id.*, quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). "The permanent termination of parental rights is 'the family law equivalent of the death penalty in a criminal case.' " *Id.*, quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist. 1991).

{¶ 44} "Thus, 'a party filing a petition for adoption who relies upon R.C. 3107.07(A) bears the burden of establishing by clear and convincing evidence that the exception to the consent requirement contained therein has been satisfied.' " *In re A.J.W.*, 2024-Ohio-3124, ¶ 51 (2d Dist.), quoting *Sunderhaus* at 132. " 'Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " *Id.,* quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. "Once the petitioner

has established one of the exceptions to the consent requirement, 'the burden of going forward shifts to the parent to show some facially justifiable cause for the failure.' " *Id.*, quoting *In re A.N.B.,* 2012-Ohio-3880, ¶ 10 (12th Dist.), citing *In re Adoption of Bovett*, 33 Ohio St.3d 102, 104 (1987). However, " '[t]he burden of proof remains with the petitioner.' " *Id.*, quoting *A.N.B.,* citing *Bovett.*

{¶ 45} In analyzing whether a biological parent has failed to engage in more than de minimis contact pursuant to R.C. 3107.07(A), the probate court applies a two-step analysis:

. . . First, the probate court must determine whether the parent has failed to provide more than de minimis contact with the child. *In re Adoption of M.M.R.*, 2017-Ohio-7222, ¶ 7 (2d Dist.). The first step involves deciding a factual question – in this case, whether Father failed to provide more than de minimis contact with [the child] for a period of at least one year immediately preceding the filing of the adoption petition. *Id.*

*A.J.W.* at ¶ 52.

{¶ 46} "Though not defined by statute, 'more than de minimis contact' implies contact – either attempted or successful – beyond a single occurrence." *In re Adoption of L.K.P.*, 2024-Ohio-2551, ¶ 10 (2d Dist.), quoting *In re Adoption of T.U.,* 2020-Ohio-841, ¶ 25 (6th Dist.). Put differently, it demands " 'more quality and quantity' and requires 'more effort from the parent to have contact and communication with the child' than is shown by a one-time contact." *Id.*, quoting *In re Adoption of K.A.H.,* 2015-Ohio-1971, ¶ 10 (10th Dist.). "Black's Law Dictionary describes de minimis as 'trifling; negligible.' "

*Id.*, quoting *Black's Law Dictionary* (11th ed. 2019.)  "De minimis contact certainly includes any physical visitation with a child, but can also include other forms of contact and support, such as 'gifts, cards, letters, financial support and telephone calls.' "  *A.J.W.* at ¶ 54, quoting *In re Adoption of A.M.D.*, 2016-Ohio-6976, ¶ 17 (7th Dist.).  We note that even the incarceration of a parent generally "does not justify the failure to have more than de minimis contact with the child, because it does not preclude other forms of contact, such as letter writing or phone calls."  *A.J.W.* at ¶ 59.

**{¶ 47}**  If the probate court finds that the parent failed to have more than de minimis contact with the child during the applicable time period, " 'the court's second step is to determine whether justifiable cause for the failure has been proven by clear and convincing evidence.' "  *Id.* at ¶ 53, quoting *M.M.R.* at ¶ 8, citing *In re Adoption of J.R.H.*, 2013-Ohio-3385, ¶ 27 (2d Dist.).  The term "justifiable cause" is not defined in R.C. 3107.07, and the Ohio Supreme Court has "refused to adopt a 'precise and inflexible meaning' " for that term; instead, it has concluded that " 'the better reasoned approach would be to leave to the probate court as finder of fact the question of whether or not justifiable cause exits.' "  (Citations omitted.)  *In re J.R.I.,* 2023-Ohio-475, ¶ 34 (2d Dist.), citing *In re Adoption of D.D.G.*, 2018-Ohio-35 (2d Dist.).  " '[A]n important consideration regarding justifiable cause is the parent's willingness and ability to . . . contact a child.' "  *In re Adoption of R.A.H.*, 2021-Ohio-1667, ¶ 14 (2d Dist.), citing *In re Adoption of Masa*, 23 Ohio St.3d 163, 166 (1986).  "Additionally, a parent's 'efforts to enforce his parental rights, prior to the filing of [a stepparent's] adoption petition' are a relevant consideration when reaching the justifiable cause conclusion."  *Id.*, citing *Adoption of M.G.B.-E.*, 2018-

Ohio-1787, ¶ 43. " '[S]ignificant interference by a custodial parent with communication between the non-custodial parent and the child, or significant discouragement of such communication, is required to establish justifiable cause for the non-custodial parent's failure to communicate with the child.' " *In re the Adoption of F.D.H.*, 2023-Ohio-730, ¶ 11, quoting *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 367-368 (1985).

{¶ 48} A directed verdict is proper "if, construing the evidence most strongly in favor of the nonmoving party, the trial court 'finds that upon any determinative issue reasonable minds could come to but one conclusion . . . and that conclusion is adverse to such party.' " *Simon v. Larreategui*, 2022-Ohio-1881, ¶ 18 (2d Dist.), citing *Mancz v. McHenry*, 2021-Ohio-82, ¶ 44 (2d Dist.), quoting Civ.R. 50(A)(4). "Because motions for directed verdicts . . . test the legal sufficiency of the evidence, not its weight or witness credibility, our review of the trial court's judgment is de novo." *Id.* at ¶ 20, citing *Schafer v. RMS Realty*, 138 Ohio App.3d 244, 257 (2d Dist. 2000).

## 1. De Minimis Contact

{¶ 49} As noted above, the relevant period herein was May 15, 2023, to May 15, 2024, the date Stepfather filed the petition to adopt the child. The probate court found that Father "had sufficient contact" during that period. Father testified that he had not had phone, email, or social media contact with the child since May 15, 2023. He also testified that he had been aware of the child's residential and school addresses and acknowledged that Mother had invited him to attend certain events with the child but, by his own admission, he chose not to attend. There was no evidence that Father sent letters or gifts to the child.

{¶ 50} The child's soccer coach testified that Father did not attend the child's soccer practices or games. Mother testified that Father repeatedly called her at work to discuss "many things," but he did not schedule parenting time with the child. Father acknowledged that he wanted to speak with Mother, did not contact the child directly on her phone or via email, and did not seek contact with her through Stepfather or Father's family members. The one time that Father did have in-person contact with the child at a festival, the child's godmother testified that Father had told her that he did not want to be there because he had other plans. Pursuant to R.C. 3107.07, Father was charged with making the effort to contact the child, and the burden was not on Mother, although she did make efforts to arrange parenting time.

## 2. Justifiable Cause

{¶ 51} The probate court determined that there was justifiable cause for Father's limited contact with the child due to Mother's interference. Although Mother had blocked Father on her own cell phone on August 17, 2023, the record reflects that Father had multiple other ways to reach his child, as one might reasonably expect him to do if he sought to form or sustain a relationship with the child. *See In re A.J.W.*, 2024-Ohio-3124, ¶ 59 (2d Dist.), quoting *In re Adoption of S.M.H.*, 2014-Ohio-45, ¶ 15 (2d Dist.). Most significantly, Mother had blocked Father on her cell phone as a means to reach the child because he had abused that method of contact, calling Mother while she was at work after she had asked him not to do so and when he knew the child would not be present, or after the child went to bed. Under these circumstances, we conclude that Father's attempts to contact Mother were not synonymous with attempting to contact the child.

*See In re Adoption of B.R.R.*, 2024-Ohio-478, ¶ 52 (7th Dist.).

{¶ 52} Stepfather testified that he had once accidentally 'butt dialed" Father on his cell phone, and Father texted him in response. This demonstrated that Father had Stepfather's phone number, and thus an additional means of contacting the child. Stepfather stated that he had not blocked Father on any social media. The soccer coach testified that she had a relationship with Father, including that he had once helped her move, and she thought he would have felt comfortable enough to reach out to her about sports or anything else regarding the child. Nothing in Stepfather's or the coach's testimony suggested that they would not have facilitated Father's contact with the child, and Mother stated that if Father had found a means to reach the child other than her cell phone, she would have allowed the contact. Father had ample means to contact the child other than Mother's cell phone.

{¶ 53} Mother's testimony further made clear that Father could have had access to the child when she and the child spent time with Father's family members. The child also had her own cell phone and email address that Father could have used to contact her directly. Mother tried to facilitate communication between Father and the child, and Father failed to demonstrate any willingness to contact the child through the several means available to him. It was not Mother's responsibility to arrange contact between the child and Father, although she made numerous attempts to do so.

{¶ 54} For the reasons set forth above, we conclude that reasonable minds certainly could have disagreed as to whether Stepfather had shown that Father failed to have more than de minimis contact with the child for one year preceding the filing of the

petition without justifiable cause. There was not insufficient evidence to support Stepfather's petition as a matter of law, and the trial court could not properly consider the weight or credibility of the evidence on a motion for directed verdict. Thus, the probate court erred in granting Father's motion for a directed verdict. Because we reach this conclusion on Stepfather's third assignment of error, we will remand for the probate court to allow Father to present his evidence and then to weigh all of the evidence to determine whether Stepfather's petition is supported by clear and convincing evidence, including as to his assertion that Father's consent to the adoption was unnecessary. We need not address Stepfather's assignments of error that the trial court's conclusion was against the manifest weight or an abuse of discretion, as those issues are not ripe for appeal at this time.

{¶ 55} Stepfather's third assignment of error is sustained. Stepfather's first and second assignments of error are not ripe for review.

{¶ 56} Stepfather's fourth assignment of error states:

THE TRIAL COURT ERRED WHEN IT FAILED TO PROPERLY CORRECT THE TRANSCRIPT TO CONFORM TO THE AUDIO RECORD OF THE HEARING.

{¶ 57} Stepfather asserts that he filed a motion to correct the record on November 4, 2024, in the probate court. He notes that an amended transcript was filed on November 18, 2024, but he contends that four requested changes "material" to his appeal were not made. Stepfather then filed a second motion to correct the record. Father points out that a second amended transcript was filed on December 9, 2024, and that the

alleged errors are so insignificant that they would not change the decision of the trial court.

{¶ 58} The audio recording of the proceedings before the probate court is not part of our appellate record. Accordingly, we have no way to compare it with the original transcript, or the amended transcript(s), as Stepfather urges us to do. Having concluded that the record reflects that Stepfather met his burden to overcome Father's motion for a directed verdict, further analysis of Stepfather's fourth assignment of error is unnecessary.

{¶ 59} Having sustained Stepfather's third assignment of error, the judgment of the probate court is reversed. The matter is remanded to the probate court for further proceedings consistent with this opinion.

. . . . . . . . . . . . .


TUCKER, J. and LEWIS, J., concur.