[Cite as *In re Adoption of M.K.B.B.*, 2026-Ohio-2001.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF M.K.B.B. AND K.E.A.B. | : | C.A. Nos. 30708, 30709 |
| | : | |
| | : | Trial Court Case Nos. 2025 ADP 00026; 2025 ADP 00027 |
| | : | |
| | : | (Appeal from Common Pleas Court- Probate Division) |
| | : | |
| | : | **FINAL JUDGMENT ENTRY & OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on May 29, 2026, the judgments of the trial court are affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.


For the court,

*Christopher B. Epley*

_____
CHRISTOPHER B. EPLEY, JUDGE

TUCKER, J., and HUFFMAN, J., concur.

**OPINION**

KELLY M. SCHROEDER, Attorney for Appellant
STEPHANIE A. GUNTER, Attorney for Appellee

EPLEY, J.

{¶ 1} Mother, the biological mother of M.K.B.B. and K.E.A.B., appeals from judgments of the Montgomery County Court of Common Pleas, Probate Division, which concluded that her consent to her children's adoption by their paternal great-aunt ("Great-Aunt") was not required. For the following reasons, the trial court's judgments are affirmed.

**I. Facts and Procedural History**

{¶ 2} Mother's son, M.K.B.B., was born in April 2012, and her daughter, K.E.A.B., was born in August 2013. M.K.B.B.'s alleged father is deceased. K.E.A.B.'s father was not identified on her birth certificate, and no one has established paternity for her. But it is believed that M.K.B.B. and K.E.A.B. have the same father. The record indicates that Mother has a third child with a different father; that child is not involved in this case.

{¶ 3} In 2015, children services became involved with Mother after her third child was born addicted to drugs. M.K.B.B. and K.E.A.B. were removed from Mother's care and placed first with their maternal grandmother and then a foster home. Around Thanksgiving 2015, Mother asked Great-Aunt if she would care for M.K.B.B. and K.E.A.B. for a month, and Great-Aunt agreed. M.K.B.B. and K.E.A.B. have resided with Great-Aunt since then.

{¶ 4} The juvenile court adjudicated the children as dependent, and children services had ongoing concerns about Mother's housing, mental health, parenting, and substance abuse. In November 2016, Great-Aunt sought legal custody of M.K.B.B. and K.E.A.B. She received legal custody of the children on January 23, 2017, when the children were three

2

and four years old. As part of the legal custody order, Mother was required to pay child support of $50 per month.

{¶ 5} On March 5, 2025, Great-Aunt filed petitions to adopt M.K.B.B. and K.E.A.B. She alleged that Mother's consent was not necessary due to Mother's lack of contact with the children and her failure to provide maintenance and support during the previous year. Mother objected to the petitions. On October 15, 2025, the trial court held a bench trial on whether Mother's consent to adoption was required; Mother and Great-Aunt both testified. Three weeks later, the court conducted in-camera interviews with the children. The record does not include a transcript of those interviews.

{¶ 6} On November 7, 2025, the trial court overruled Mother's objections to the adoption petitions and found that her consent was not required. Mother appeals the trial court's judgments, claiming that the court's decision was against the manifest weight of the evidence. Great-Aunt has not filed a responsive brief.

## II. Consent Requirement

{¶ 7} A parent has a fundamental right to care for and have custody of his or her child, and those rights are terminated when a child is adopted. *In re Adoption of M.M.R.*, 2017-Ohio-7222, ¶ 5 (2d Dist.). "Because adoption acts to permanently terminate parental rights, the written consent of a minor child's parents is ordinarily required in order to proceed with the adoption action." *In re L.R.O.*, 2020-Ohio-3200, ¶ 7 (2d Dist.).

{¶ 8} R.C. 3107.07(A) provides exceptions to the consent requirement. When Great-Aunt's adoption petitions were filed on March 5, 2025, R.C. 3107.07(A) provided that consent to adoption by a minor child's parent was not required "when it is alleged in the adoption petition and the court, after proper service of notice and hearing, finds by clear and convincing evidence that the parent has failed without justifiable cause [(1)] to provide more

3

than de minimis contact with the minor or [(2)] to provide for the maintenance and support of the minor . . . for a period of at least one year immediately preceding . . . the filing of the adoption petition." *See* former R.C. 3107.07(A) (as enacted in 2014 S.B. No. 207 and 2014 S.B. No. 250, effective March 23, 2015).

{¶ 9} R.C. 3107.07(A) is written in the disjunctive. Consequently, the failure, without justifiable cause, to provide either more than de minimis contact or maintenance and support for the one-year period is sufficient to eliminate the need for consent. *In re Adoption of E.A.K.*, 2021-Ohio-1835, ¶ 19 (2d Dist.).

**A. Contact with the Children**

{¶ 10} We begin with the trial court's determination that Mother failed, without justifiable cause, to have more than de minimis contact with her children in the year preceding the filing of the adoption petitions. Mother emphasizes that she had three telephone calls with the children, which she claims constituted more than de minimis contact.

{¶ 11} In this appellate district, courts employ a two-step process when applying the contact prong of R.C. 3107.07(A). *In re Adoption of J.R.I.*, 2023-Ohio-475 (2d Dist.). First, the court must decide whether the parent has failed to have *more than* de minimis contact with the child. *M.M.R.*, 2017-Ohio-7222, at ¶ 7 (2d Dist.). Contact includes not only physical contact, but also other forms of contact, such as gifts, cards, letters, telephone calls, and text messages. *See In re A.J.W.*, 2024-Ohio-3124, ¶ 54 (2d Dist.). Though not defined by statute, "more than de minimis contact" implies contact—either attempted or successful—beyond a single occurrence. *In re Adoption of T.U.*, 2020-Ohio-841, ¶ 25 (6th Dist.). That is, it demands "'more quality and quantity' and requires 'more effort from the parent to have contact and communication with the child' than is shown by a one-time contact." *Id.*, quoting

4

*In re Adoption of K.A.H.*, 2015-Ohio-1971, ¶ 10 (10th Dist.). *Black's Law Dictionary* describes de minimis as "trifling; negligible." *Black's Law Dictionary* (11th Ed. 2019).

{¶ 12} Probate courts have much discretion over factual determinations—such as whether there has been more than de minimis contact—and those determinations will not be disturbed absent an abuse of discretion. *In re Adoption of M.B.*, 2012-Ohio-236, ¶ 21-23; *In re Adoption of J.R.H.*, 2013-Ohio-3385, ¶ 25-28 (2d Dist.). To constitute an abuse of discretion, a trial court's action must be arbitrary, unreasonable, or unconscionable. *Ojalvo v. Bd. of Trustees of Ohio State Univ.*, 12 Ohio St.3d 230, 232 (1984).

{¶ 13} If the probate court determines that the parent had only de minimis (or no) contact, the next step is to "determine whether justifiable cause for the failure has been proven by clear and convincing evidence." *M.M.R.* at ¶ 8. The term "justifiable cause" is not defined in R.C. 3107.07, but important considerations include the parent's willingness and ability to contact the child and the parent's efforts to enforce his or her parental rights. *In re Adoption of G.A.J.-K.*, 2025-Ohio-1276, ¶ 47 (2d Dist.). Significant interference by the child's custodian with communication between the non-custodial parent and the child, or significant discouragement of such communication, is required to establish justifiable cause for the non-custodial parent's failure to communicate with his or her child. *In re the Adoption of F.D.H.*, 2023-Ohio-730, ¶ 11; *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 367-368 (1985).

{¶ 14} The trial court's ruling regarding justifiable cause will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re Adoption of Masa*, 23 Ohio St.3d 163 (1986), paragraph two of the syllabus. "In reviewing whether a judgment is against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a

manifest miscarriage of justice that there must be a reversal of the judgment and an order for a new trial." *In re Adoption of D.X.B.*, 2025-Ohio-2354, ¶ 12 (2d Dist.).

{¶ 15} At the consent hearing, Great-Aunt testified that she had lived in the same home since 2017 and that Mother had been to the residence. Mother had Great-Aunt's cell phone number, which had not changed in the last eight or nine years. Mother and Great-Aunt communicated through Facebook Messenger and by phone. Great-Aunt had not blocked Mother from contacting her. Great-Aunt did not know if she had received messages from Mother between March 2024 and March 2025. Great-Aunt indicated that she would have to look at her messages to see. Great-Aunt denied deleting any of Mother's messages.

{¶ 16} Great-Aunt told the trial court that Mother had "hardly any" contact with the children in the beginning of 2024, and she was not aware of any contact with the children from March 2024 to March 2025. After March 2025, Mother began to repeatedly "bug" Great-Aunt for contact with M.K.B.B. and K.E.A.B. Great-Aunt stated that the children have their own cell phones and that Mother had "[m]aybe a phone call that kids may have answered. I'm not sure." Great-Aunt did not look at the children's phones. Great-Aunt recalled that Mother had come to her workplace to ask why Great-Aunt was cutting off contact with the children. Great-Aunt did not remember when that occurred.

{¶ 17} Mother testified that she and Great-Aunt went to court in 2018 to address parenting time, and they agreed that Mother would see the children every other weekend. According to Mother, she visited with the children in accordance with that arrangement for five years. She last saw the children at Christmastime in 2023. Mother has not returned to the juvenile court since 2018.

{¶ 18} In 2024, Mother relapsed and admittedly "wasn't making the best decisions." Mother indicated that she was in treatment three times between March 2024 and March

2025. Mother acknowledged that during that time, being around her may not have been in the children's best interest, but she believed that it was in the children's best interest that they be able to communicate with her by phone.

{¶ 19} Mother testified that she reached out "plenty of times. Hundreds of times." Mother stated that she contacted Great-Aunt, but Great-Aunt never answered her phone calls and never responded to her Facebook messages, although she had opened them. When Mother was asked if she had documentation that she had contacted Great-Aunt hundreds of times, she replied that "[i]t's just a coincidence that the year that I needed is deleted off of Facebook and that year says something about the encrypted messages and just that one year is all gone. But there's previous and after – that just one year is coincidentally off the record." Mother did not have any evidence that she had left voicemails with Great-Aunt.

{¶ 20} Mother also called the children's phones, and she indicated that she had talked to her children three times between March 2024 and March 2025. Mother said that she spoke with the children "when they could sneak an answer." Mother was able to have longer conversations with her children during those phone calls.

{¶ 21} Mother recounted that she had gone to Great-Aunt's workplace in September 2024 to ask why Great-Aunt had cut off contact so abruptly. Mother was aware that Great-Aunt was planning to file for adoption, and Great-Aunt had told her that they should meet to discuss it. Great-Aunt reportedly told Mother that visitation could return to normal after the adoption, but her attorney had advised her not to contact Mother or let the children contact her.

{¶ 22} Mother stated that she was allowed to work while she was in treatment. However, she was "working on learning how to put my recovery first." She also was working toward a peer support certificate.

{¶ 23} On this record, the trial court did not abuse its discretion in concluding that Mother failed to have more than de minimis contact with M.K.B.B. and K.E.A.B. The trial court found that Great-Aunt's testimony was credible and that she had complied with the juvenile court's order on visitation. In contrast, the trial court found that Mother's statement that she had attempted to contact the children and Great-Aunt "hundreds of times" was not credible. Mother acknowledged that she had not seen the children since Christmas of 2023, and there was no evidence that she had sent the children cards or gifts. Mother's contact consisted of three telephone calls. Although there was *some* contact, the trial court reasonably concluded that three calls within a one-year period did not amount to *more than* de minimis contact.

{¶ 24} The trial court's conclusion that Mother lacked justifiable cause for her failure to have more than de minimis contact with her children also was not against the manifest weight of the evidence. Mother testified that Great-Aunt did not allow her to see the children or respond to her calls and messages, but the trial court was free to disbelieve that Mother had attempted to contact Great-Aunt as much as Mother had claimed. Mother presented no evidence to substantiate her attempts to contact Great-Aunt, and the court reasonably credited Great-Aunt's statement that she did not delete communications from Facebook. Mother acknowledged that it might not have been in the children's best interest to be around her during her relapse, and she made no effort to enforce visitation through the juvenile court during the relevant one-year period. In addition, the children had cell phones, which Great-Aunt indicated she did not monitor, and the evidence reasonably supported the conclusion

8

that Mother could have communicated directly with the children through their cell phones (and, at times, did). The trial court's finding that Mother lacked justifiable cause for failing to have more than de minimis contact in the year prior to the filing of the adoption petition was not against the manifest weight of the evidence.

### B. Maintenance and Support

{¶ 25} The probate court also determined that Mother had failed, without justifiable cause, to provide for the children's maintenance and support. This conclusion is supported by the record.

{¶ 26} As to whether a parent has failed to provide for the support and maintenance of a child, the court must use a three-step process. First, it must determine what the law or judicial decree required of the parent during the year preceding the filing of the adoption petition. *In re Adoption of A.K.*, 2022-Ohio-350, ¶ 14. This is so because "to determine whether a parent complied with the maintenance and support prong, the court necessarily needs to know the parent's obligation as required by law or judicial decree for the year prior to the filing of the petition." *J.R.I.*, 2023-Ohio-475, at ¶ 31 (2d Dist.). Next, the court must decide if the parent met his or her obligation under the law or judicial decree. *A.K.* at ¶ 14, citing *In re Adoption of B.I.*, 2019-Ohio-2450, ¶ 15. Finally, if the obligation was not met, the court must determine whether there was justifiable cause for that failure. *Id*.

{¶ 27} Great-Aunt testified at the consent hearing that Mother was required to pay child support of $50 per month as part of the 2017 legal custody order. According to Great-Aunt, the only time that Mother "was good at it was during COVID." Mother's payments "slacked off" and then dwindled to nothing by 2024. Great-Aunt testified, and Mother agreed, that Mother did not pay anything between March 2024 and March 2025. Mother indicated that she had made a couple of payments after March 2025, with the last payment in

9

July 2025 in the amount of $23.63. There was no testimony that Mother had provided any other form of maintenance and support. The trial court thus reasonably concluded that Mother had not provided for the support and maintenance of M.K.B.B. and K.E.A.B. in the year preceding the filing of the adoption petitions.

{¶ 28} As to whether Mother's failure to provide maintenance and support was justified, Mother testified that she was in drug treatment on three occasions between March 2024 and March 2025 and that she did so "to get better for my kids and myself." Mother acknowledged that her drug treatment did not preclude employment, but she stated that she was "working on learning how to put my recovery first" and also working toward her peer support certificate. Mother did not indicate whether she had employment at any time between March 2024 and March 2025 or testify about the state of her finances generally. Mother did not seek a reduction in her support obligation from the juvenile court.

{¶ 29} Mother argues that her failure to support the children during the one-year period was justified by her participation in drug treatment and Great-Aunt's interference with her relationship with her children. However, Mother did not explain how her participation in drug treatment precluded her from providing the required child support or other maintenance and support. To the contrary, she acknowledged that she was permitted to work while she was in treatment. *Compare In re Adoption of A.O.P*., 2022-Ohio-2532 (12th Dist.).

{¶ 30} With respect to Great-Aunt's alleged interference with contact, a parent's lack of contact and the parent's failure to provide support are typically separate inquiries, but the two issues may overlap when the interference prevents the parent from providing support. *See In re Adoption of J.M.N*., 2008-Ohio-4394, ¶ 25 (2d Dist.); *In re Adoption of J.J.P*., 2020-Ohio-679, ¶ 27 (8th Dist.). Here, Mother knew where Great-Aunt and the children resided, she had been to their home, and she could communicate with Great-Aunt by phone or

Facebook. Mother knew that Great-Aunt was receiving her messages. Mother provided no evidence that Great-Aunt's failure to respond to her precluded her from providing the required support. As stated in *J.J.P.*, "This is not a case in which, due to the interference of others, the parent did not know where her child lived and, therefore, did not know where to send support." *Id*. at ¶ 27.

{¶ 31} On this record, we cannot conclude that the trial court lost its way when it concluded that Mother's failure to provide maintenance and support was not justified. The trial court's determination was not against the manifest weight of the evidence.

{¶ 32} Accordingly, Mother's assignment of error is overruled.

### III. Conclusion

{¶ 33} The trial court's judgments are affirmed.

. . . . . . . . . . . . .

TUCKER, J., and HUFFMAN, J., concur.